## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ASPECT SOFTWARE PARENT, INC., *et al.*,[1] | Case No. 16-10597 (MFW) |
| Debtors. | (Jointly Administered) |
| | Docket No. 16, 65 |

### FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POST-PETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, AND 364; AND (B) USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; AND (II) GRANTING LIENS AND SUPERPRIOROTY CLAIMS

Upon the motion (the "Motion") dated March 9, 2016 (the "Petition Date") of the above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Cases" or "Chapter 11 Cases"), pursuant to sections 105, 362, 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code"), rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules") and rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (as amended, the "Local Rules"), seeking, among other things:

(I)      authorization for Aspect Software, Inc. (the "Borrower") to obtain postpetition financing in the form of a non-amortizing multiple draw term loan facility in an aggregate principal amount of $30,000,000 (the "DIP Facility"), subject to and pursuant to the terms and conditions of the Interim Order (as defined below), on an

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Aspect Software Parent, Inc. (3231); Aspect Software, Inc. (4368); VoiceObjects Holdings Inc. (0138); Voxeo Plaza Ten, LLC (7028); and Davox International Holdings, LLC (1081).  The location of parent Debtor Aspect Software Parent, Inc.'s corporate headquarters and the Debtors' service address is:  2325 E. Camelback Road, Suite 700, Phoenix, Arizona, 85016.

interim basis, and as set forth in this order (the "Final Order") on a final basis and the Debtor-In-Possession Credit Agreement (substantially in the form attached to this Motion as Exhibit A, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "DIP Credit Agreement" and together with all agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith, as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "DIP Documents"), among the Borrower, the other Debtors party thereto as guarantors, Wilmington Trust, N.A., acting as the administrative and collateral agent (in such capacities, the "DIP Agent"), and the lenders from time to time party thereto (the "DIP Lenders").

(II)    authorization for the Debtors to execute and deliver the DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith.

(III)    authorization for the Debtors to use proceeds of the DIP Facility as permitted in the DIP Documents and in accordance with the Interim Order and this Final Order (together, the "DIP Orders") to provide working capital to the Debtors and pay fees and expenses in connection with DIP Facility and the Cases;

(IV)    authorization for the Debtors to (i) use Cash Collateral (as defined below) pursuant to sections 361, 362 and 363 of the Bankruptcy Code, on the terms described herein and (ii) provide adequate protection on the terms set forth in the DIP Orders to the

Prepetition Secured Parties (as defined below) whose liens and security interests are being primed by the DIP Facility;

(V)    authorization for the DIP Agent to terminate the DIP Facility and the applicable DIP Documents upon the occurrence and continuance of an Event of Default (as defined therein);

(VI)    authorization to grant first priority superpriority claims to the DIP Lenders and first priority priming liens in favor of the DIP Agent (for the benefit of the DIP Lenders) on all prepetition and postpetition property of the Debtors' estates and all proceeds thereof, subject to the Carve-Out (as defined below) and the terms of the DIP Orders (as defined below);

(VII)    the waiver by the Debtors of any right to surcharge against the Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code or otherwise;

On March 11, 2016, the Court held an interim hearing (the "Interim Hearing") to consider the Motion and entered an order (the "Interim Order" and, together with the Final Order, the "DIP Orders") which, among other things, (i) approved the Motion on an interim basis and (ii) scheduled the final hearing (the "Final Hearing") to consider approval of the Motion on a final basis.

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.    Jurisdiction.  This Court has core jurisdiction over these Cases, the Motion, the DIP Orders, and the parties and property affected hereby under 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    Notice.  The notice given by the Debtors of the Motion, the Interim Hearing and the Final Hearing, which included service upon (a) the United States Trustee for the

3

District of Delaware; (b) counsel to the agent for the Debtors' prepetition first lien lenders; (c) counsel to the DIP Agent; (d) counsel to the indenture trustee for the second lien noteholders; (e) the United States Securities and Exchange Commission; (f) the Internal Revenue Service; (g) the Office of the United States Attorney for the District of Delaware; (h) the parties included on the Debtors' consolidated list of fifty (50) largest unsecured creditors; (i) counsel to the Steering Committee[2]; (j) counsel to the Ad Hoc Crossover Lender Group; and (k) all other known parties asserting a lien against the Debtors' assets, constitutes due and sufficient notice under the circumstances and complies with Bankruptcy Rules 4001(b) and (c) and Local Rule 4001-2. No further notice of the relief sought at the Final Hearing is necessary or required.

3.    <u>Creditors' Committee Formation</u>.  No statutory committee of unsecured creditors has yet been appointed in the Chapter 11 Cases (the "<u>Creditors' Committee</u>").

4.    <u>Debtors' Stipulations</u>.  Without prejudice to the rights of certain parties-in-interest, other than the Debtors, to challenge the Prepetition Secured Parties' claims and liens before the termination of the Challenge Period (as defined herein) as set forth in paragraph 26, the Debtors admit, stipulate and agree that:

(a)    <u>The Prepetition Credit Agreement</u>.

(i)    The Borrower, Aspect Software Parent, Inc., the guarantors party thereto, lenders party thereto (the "<u>Prepetition First Lien Lenders</u>") and Wilmington Trust, National Association (as successor to JPMorgan Chase Bank, N.A.), as administrative and collateral agent, in its capacity as such (the "<u>First Lien Agent</u>" and, together with the Prepetition First Lien Lenders, the "<u>Prepetition First Lien Secured Parties</u>") are parties to that certain Credit Agreement, dated as of May 7, 2010 (as amended, supplemented or otherwise modified from

---

[2]    "Steering Committee" shall mean the "Consenting First Lien Committee" as defined in the Plan Support Agreement between the Debtors, Ad Hoc Crossover Lender Group and Consenting First Lien Committee.

time to time, the "Prepetition Credit Agreement" and together with all agreements, documents,

certificates and instruments, including that certain Guarantee and Collateral Agreement, dated as

of May 7, 2010 (as amended, supplemented or otherwise modified from time to time, the "1L

Collateral Agreement"), delivered or executed from time to time in connection therewith, as

amended, restated, amended and restated, supplemented, or otherwise modified from time to

time in accordance with the terms thereof, collectively, the "Prepetition First Lien Loan

Documents"). The Prepetition Credit Agreement provides for the making of term and revolving

loans to the Borrower as provided therein (the "Prepetition First Lien Loans").

    (ii)  As of the Petition Date, the borrowings under the

Prepetition Credit Agreement consisted of:  (a) $447,262,817.90 in term loans, (b) $29,000,000

in revolving loans and (c) $1,000,000.00 in letters of credit, plus accrued and unpaid interest,

fees, expenses, penalties, premiums, charges and any other obligations incurred in connection

therewith, in each case in accordance with the Prepetition First Lien Loan Documents, the

("Prepetition First Lien Debt" or "Prepetition First Lien Obligations").

    (iii)  To secure the Prepetition First Lien Debt, the Debtors

entered into the 1L Collateral Agreement and various other security agreements and collateral

documents, pursuant to which they granted to the Prepetition First Lien Secured Parties, valid,

binding, perfected, first-priority liens and security interests (the "Prepetition First Priority

Liens") in substantially all of their assets, subject to customary limitations, as set forth in the

Prepetition First Lien Loan Documents (collectively, the "Prepetition Collateral").

    (b)  The Prepetition Second Lien Indenture.

    (i)  Pursuant to that certain Indenture, dated as of May 7, 2010

(as heretofore supplemented from time to time, the "Prepetition Second Lien Indenture") by and

5

among the Borrower, the guarantors party thereto and U.S. Bank National Association, as trustee (in its capacity as such, the "Second Lien Indenture Trustee"), the Borrower issued 10-5/8% senior second lien notes due 2017 (the "Prepetition Second Lien Notes", and holders thereof, the "Prepetition Second Lien Noteholders", and together with the Second Lien Indenture Trustee, the "Prepetition Second Lien Secured Parties" and, collectively with the Prepetition First Lien Secured Parties, the "Prepetition Secured Parties").

(ii)     As of the Petition Date, the outstanding aggregate principal amount of Prepetition Secured Notes issued under the Prepetition Second Lien Indenture was $320,000,000 (together with all other outstanding obligations thereunder, as defined in the Indenture, the "Prepetition Second Lien Notes Debt", and together with the Prepetition First Lien Debt, collectively, the "Prepetition Obligations").

(c)     To secure the Prepetition Second Lien Notes Debt, the Debtors and the Second Lien Indenture Trustee, as collateral agent for the Prepetition Second Lien Noteholders (in its capacity as such, the "Second Lien Collateral Agent"), entered into that certain Security Agreement, dated as of May 7, 2010 (the "2L Security Agreement," and together with the Prepetition Second Lien Indenture and all agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith, as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "Prepetition Second Lien Notes Documents," and together with the Prepetition First Lien Loan Documents, the "Prepetition Documents"), pursuant to which the Debtors granted to the Second Lien Collateral Agent, for the benefit of itself and the Prepetition Second Lien Noteholders, valid, binding, perfected, second-priority liens and security interests (the "Prepetition Second Priority Liens," and

6

together with the Prepetition First Priority Liens, the "Prepetition Liens") in the Prepetition

Collateral.

(d)    The Prepetition Obligations constitute a legal, valid, binding non-

avoidable obligation of the Debtors.  The Prepetition Liens are valid, binding, enforceable,

non-avoidable and perfected liens on and security interests in the Prepetition Collateral, subject

in each case, solely as among the Prepetition Secured Parties, to the term of the Intercreditor

Agreement (as defined herein), and no portion of the Prepetition Obligations or Prepetition

Liens is subject to any challenge or defense, including avoidance, reduction, offset, attachment,

disallowance, disgorgement, recharacterization, surcharge, recovery or subordination pursuant

to the Bankruptcy Code or applicable nonbankruptcy law.

5.    Cash Collateral.   For purposes of this Final Order, the term "Cash

Collateral" shall include all cash proceeds of the Prepetition Collateral and shall have the

meaning ascribed to it in section 363(a) of the Bankruptcy Code.

6.    Use of Cash Collateral.  The Debtors are hereby authorized, subject to the

terms and conditions of the DIP Documents, this Final Order and in accordance with the Budget

Covenant (as defined below), to use Cash Collateral for working capital and general corporate

purposes in accordance herewith.  The Debtors' right to use the Cash Collateral shall terminate

on the earlier of:  (i) the Termination Date, as defined in the DIP Credit Agreement; and (ii) the

occurrence of an Event of Default under the DIP Documents or this Final Order, subject to the

DIP Agent (or, following the repayment and termination of the DIP Facility, the Steering

Committee) providing the Debtors, with a copy to the Debtors' counsel and the U.S. Trustee,

five (5) days' prior written notice (which shall run concurrently with any notice provided under

the DIP Documents).  The Debtors may request an expedited hearing on any motion regarding an

7

alleged Event of Default notice and the DIP Agent and the DIP Lenders shall consent to such expedited hearing.

7.    Findings Regarding the Financing and Use of Cash Collateral.

(a)    Good cause has been shown for the entry of this Final Order.

(b)    The Debtors have a current and ongoing need to obtain the full amount of the financing provided under the DIP Facility and the use of Cash Collateral in order to, among other things, permit the orderly continuation of their businesses, preserve going concern value, maintain business relationships with vendors, suppliers and customers, satisfy payroll obligations, pay for certain costs and expenses related to the Debtors' Chapter 11 Cases, and satisfy the Debtors' other working capital and operational needs. The access of the Debtors to sufficient working capital and liquidity made available through the DIP Facility and the use of Cash Collateral and other financial accommodations under the DIP Facility and hereunder is vital to the preservation and maintenance of the Debtors' going concern value and to the Debtors' successful reorganization.

(c)    The Debtors are unable to obtain sufficient financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain secured credit allowable solely under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code.

(d)    The DIP Agent and the DIP Lenders are willing to provide the DIP Facility, subject to the terms and conditions set forth in the DIP Documents and the provisions of this Final Order, as applicable, and provided that the DIP Liens (as defined below), the DIP Superpriority Claims (as defined below) and other protections granted by the DIP Orders and

8

the DIP Documents will not be affected by any subsequent reversal or modification of this Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility approved by this Final Order. The DIP Agent and the DIP Lenders have acted in good faith in agreeing to provide the DIP Facility approved by this Final Order and to be further evidenced by the DIP Documents and their reliance on the assurances referred to above is in good faith.

(e)    Among other things, entry of this Final Order will minimize disruption of the Debtors' businesses and operations by enabling them to meet payroll and other critical expenses, including vendor and professional fees. The DIP Facility is vital to avoid harm to the Debtors' estates, which will otherwise occur if continued access to the DIP Facility is not obtained. Consummation of the DIP Facility pursuant to the terms hereof is therefore in the best interests of the Debtors' estates.

(f)    The DIP Documents and the DIP Facility contemplated thereunder, each as authorized hereunder, have been negotiated in good faith and at arm's length among the Debtors, the DIP Agent, the DIP Lenders and the Steering Committee, respectively, among others, and the terms of the DIP Facility are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration. All of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the DIP Facility and the DIP Documents, including, the Obligations (as defined in the DIP Credit Agreement, the "DIP Obligations"), shall be deemed to have been extended by the DIP Agent and the DIP Lenders and their affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the

9

Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

        (g)    The Court grants the Debtors permission on a final basis to borrow up to an aggregate principal amount of $30,000,000 on the terms set forth herein and under the DIP Documents. This Court concludes that entry of this Final Order is in the best interests of the Debtors and their estates and creditors as its implementation will, among other things, allow the Debtors to facilitate their chapter 11 goals and maximize the value of their assets.

        (h)    Based upon the record before the Court, the terms of the DIP Facility, the Debtors' use of Cash Collateral and the adequate protection granted in the DIP Orders have been negotiated at arm's length and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and are in the best interests of the Debtors and their estates and creditors and are consistent with the Debtors' fiduciary duties.

        (i)    The First Lien Agent, the Second Lien Indenture Trustee and the Second Lien Notes Collateral Agent, as applicable, have consented to (or, as applicable, have been directed to, or it has been asserted that they are deemed to have consented to pursuant to the Intercreditor Agreement, dated as of May 7, 2010 (as amended, supplemented or otherwise modified from time to time, the "Intercreditor Agreement")), the Debtors' entry into the DIP Facility, including the granting of priming liens and claims in connection therewith, and the continued use of Cash Collateral, on the terms and conditions set forth in this Final Order.

        8.      Authorization of the Financing and the DIP Documents.

        (a)    The Debtors were, pursuant to the Interim Order, and hereby are, authorized to execute, issue, deliver, enter into, adopt and perform under, as the case may be,

the DIP Documents and any related documents, including, without limitation, the Approved Budget (as defined herein).

(b)    In furtherance of the foregoing and without further approval of this Court, each Debtor was, pursuant to the Interim Order, and is hereby, authorized to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and, without further application to the Court, to pay all fees and expenses referred to in this Final Order and the DIP Documents, including, without limitation, the reasonable fees and out-of-pocket expenses of the professionals of the DIP Agent and the DIP Lenders, including the fees and expenses of counsel to the Steering Committee (whether incurred pre- or postpetition). Such fees and expenses shall be paid in accordance with this Final Order and the DIP Documents and shall be indefeasibly paid in cash in full on or before the effective date of any plan of reorganization in the these Chapter 11 Cases.

(c)    The Debtors are further hereby authorized to execute, deliver and perform one or more amendments or modifications to the DIP Documents in such form as the Debtors, the DIP Agent and the Required Lenders (as provided in the DIP Documents) may agree; it being understood that no further approval of this Court shall be required for non-material amendments, waivers, consents or other modifications to and under the DIP Documents (and any reasonable fees paid in connection therewith); provided that any material amendment or modification to the DIP Documents, including for the avoidance of doubt any amendment or modification to (A) shorten the maturity or the scheduled termination date thereunder, or (B) increase the commitments, the rate of interest, or the fees payable thereunder, shall be subject to Court approval on not less than five (5) business days' notice.

11

(d)    The Debtors are further hereby authorized to (i) make the non-refundable payment to the DIP Agent or the DIP Lenders, as the case may be, of any fees and other amounts due, including any reimbursement of indemnified obligations referred to in the DIP Documents (and in any separate letter agreements between such applicable parties and the Debtors in connection with the DIP Facility) and reasonable costs and expenses as may be due from time to time, including, without limitation, the reasonable fees and expenses of the professionals retained by the DIP Agent and DIP Lenders, including counsel to the Steering Committee (whether pre or postpetition), without the need to file retention motions or fee applications; (ii) perform all other acts required under or in connection with the DIP Documents, including the granting and perfection of the DIP Liens and the DIP Superpriority Claims as permitted or provided in the DIP Orders and the DIP Documents; and (iii) cause the execution and delivery of and performance under the Collateral Agreement (as defined in the DIP Credit Agreement or any other DIP Documents).

(e)    Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with their terms.  No obligation, payment, transfer or grant of a security or other interest under the DIP Documents, the Interim Order or this Final Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, set-off, recoupment or counterclaim.

(f)    The Debtors' borrowings from the DIP Lenders under the DIP Facility and the use of Cash Collateral hereunder will be used, in a manner consistent with the terms and conditions of the DIP Documents and this Final Order and otherwise in accordance with the

12

Budget Covenant, subject to permitted variances, for (a) working capital and other general corporate purposes, (b) the costs of administration of these Chapter 11 Cases, including the payment of fees to the office of the United States Trustee, and (c) payment of prepetition costs and expenses to the extent authorized to be paid in any "first day" or "second day" orders, the Approved Budget or the DIP Documents or as hereafter are consented to by the DIP Agent and the Required Lenders (as defined in the DIP Documents), in their sole discretion, or the Steering Committee following the repayment and termination of the DIP Facility.

(g)   (i) The proceeds from the DIP Loans and Cash Collateral shall not be loaned or advanced to, or invested in (in each case, directly or indirectly), any entity that is not a Loan Party (as defined in the DIP Credit Agreement); (ii) to the extent the Debtors wish to make any payment or transfer from a Debtor to a non-Debtor affiliate or foreign subsidiary of the Debtors, such payment or transaction must be (1) made in accordance with, and specifically identified in, the Approved Budget, (2) in the ordinary course of the operation of the Debtors' businesses and consistent with historical practices, and (3) in accordance with the DIP Documents; and (iii) to the extent any intercompany loans or claims are permitted under this Final Order and the DIP Documents, such loans and claims shall be pledged as collateral to the DIP Agent in accordance with the DIP Documents.  For the avoidance of doubt, any such permitted intercompany loans or claims of Debtors will be subordinated to the DIP Obligations (as defined below) and the liens securing the DIP Facility and Adequate Protection Liens (as defined below) on terms satisfactory to the DIP Agent, Required Lenders and Steering Committee in their sole discretion.

13

9.    <u>Superpriority Claims</u>.

(a)    Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed claims against the Debtors with priority over any and all administrative expenses, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (the "<u>DIP Superpriority Claims</u>"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and their estates and all proceeds thereof, subject only to the payment of the Carve Out (as defined below) to the extent specifically provided for herein.  Any payments, distributions or other proceeds received on account of such DIP Superpriority Claims shall be promptly delivered to the DIP Agent to be applied or further distributed by the DIP Agent on account of the DIP Obligations in such order as is specified in this Final Order or the DIP Documents, as applicable.  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order, Final Order or any provision hereof or thereof is vacated, reversed or modified, on appeal or otherwise.

(b)    As used in this Final Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below) in an amount agreed upon with the United States Trustee or as

14

ordered by the Court; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee

under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in

(iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or

otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or

firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the

"Debtor Professionals") and any statutory committee appointed in the Cases pursuant to section

1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor

Professionals, the "Professional Persons") at any time on or before the first business day

following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether

allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed

Professional Fees of Professional Persons in an aggregate amount not to exceed $2,000,000

incurred after the first business day following delivery by the DIP Agent of the Carve Out

Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or

otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice

Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice

delivered by email (or other electronic means) by the DIP Agent to the Debtors, their counsel

and the U.S. Trustee, which notice may be delivered following the occurrence and during the

continuation of an Event of Default and acceleration of the DIP Obligations under the DIP

Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

       (c)    Carve Out Reserves. On the day on which a Carve Out Trigger Notice is given by

the DIP Agent to the Debtors (the "Termination Declaration Date"), the Carve Out Trigger

Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors under the DIP

Credit Agreement in an amount equal to the then unpaid amounts of the Allowed Professional

15

Fees (any such amounts actually advanced shall constitute DIP Obligations) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also be deemed a request by the Debtors under the DIP Credit Agreement, in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Obligations).  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.  On the first business day after the DIP Agent gives such notice to such DIP Lenders (as defined in the DIP Credit Agreement), notwithstanding the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for Loans under the DIP Credit Agreement or the occurrence of the Termination Date, each DIP Lender with an outstanding Commitment (on a pro rata basis based on the then outstanding Commitments and in no event in excess of such Commitment) shall make available to the DIP Agent such DIP Lender's pro rata share with respect to such borrowing in accordance with the DIP Facility.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (ii) through (iii) of the definition of Carve Out set forth above, but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and

16

then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay

the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been

indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any

such excess shall be paid to the Prepetition First Lien Lenders in accordance with their rights and

priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall

be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth

above, and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to

zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have

been indefeasibly paid in full, in cash and all Commitments have been terminated, in which case

any such excess shall be paid to the Prepetition First Lien Lenders in accordance with their rights

and priorities as of the Petition Date.  Notwithstanding anything to the contrary in the DIP

Documents, or the DIP Orders, following delivery of a Carve Out Trigger Notice, the DIP Agent

and the First Lien Agents shall not sweep or foreclose on cash (including cash received as a

result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves

have been fully funded, but shall have a security interest in any residual interest in the Carve Out

Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP

Documents.  Further, notwithstanding anything to the contrary in this Final Order,

(i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans (as

defined in the DIP Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure

of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the

priority of the Carve Out, and (iii) in no way shall the Initial Budget, the Approved Budget, Post

Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a

cap or limitation on the amount of the Allowed Professional Fees due and payable by the

17

Debtors. For the avoidance of doubt and notwithstanding anything to the contrary herein, in the DIP Facility, or in any Prepetition Documents, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the Prepetition Secured Parties' Superpriority Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Obligations.

(d)     <u>No Direct Obligation To Pay Allowed Professional Fees</u>. The DIP Agent and DIP Lenders shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Final Order or otherwise shall be construed to obligate the DIP Agent or the DIP Lenders, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)     <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(f)     <u>Payment of Carve Out On or After the Termination Declaration Date</u>. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall otherwise be entitled to the protections granted under this Final Order, the Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

10.     <u>DIP Liens</u>.

18

As security for the DIP Obligations, effective and perfected upon the date of the Interim Order or this Final Order, as applicable, and without the necessity of the execution, recordation or filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agent or any DIP Lender of, or over, any DIP Collateral, the security interests and liens identified in subparagraphs (a), (b), (c) and (d) below are hereby granted to the DIP Agent for its own benefit and the benefit of the DIP Lenders (all property identified in clauses (a), (b), (c) and (d) below, together with all other property to which the DIP Agent is granted a lien under the DIP Documents (other than as expressly excluded pursuant to this Final Order or the DIP Documents), being collectively referred to as the "DIP Collateral", and all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the respective DIP Lenders, pursuant to the DIP Orders and the DIP Documents, the "DIP Liens"; provided, that, the DIP Collateral shall not include (i) more than 65% of the outstanding voting equity interests of any foreign subsidiary of the Debtors or (ii) the equity interests of a foreign subsidiary of the Debtors that is itself owned by foreign subsidiary, in each case to the extent the pledge of such equity pledge would result in an adverse tax consequence for the Debtors). Notwithstanding the foregoing, the DIP Agent may take any action (and are, to the extent necessary in connection herewith or therewith, hereby granted relief from the automatic stay), to evidence, confirm, validate or perfect, or to ensure the contemplated priority of, such liens, and the Debtors shall execute and deliver to the DIP Agent and the DIP Lenders all such financing statements, notices and other documents as the DIP Agent or any DIP Lender may reasonably request in connection therewith and shall deliver account control agreements or other documentation in respect of and

19

evidencing perfection of all collection and deposit accounts to the extent required by the DIP Documents.

      (a)   <u>First Lien on Unencumbered Property</u>.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all pre- and postpetition tangible and intangible property of the Debtors and the Debtors' estates, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (or to valid liens in existence as of the Petition Date that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code) (collectively, "<u>Unencumbered Property</u>"), including without limitation, all inventory, accounts receivable, general intangibles, chattel paper, contracts, owned real estate, real and personal property leaseholds, property, plants, fixtures and machinery and equipment, vehicles, vessels, deposit accounts, cash and Cash Collateral of the Debtors (whether maintained with the DIP Agent or otherwise) and any investment of such cash and Cash Collateral, letter of credit rights, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property and stock of subsidiaries of the Debtors.

      (b)   <u>Priming Liens on Prepetition Collateral</u>.  Pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Agent, for the benefit of the DIP Lenders, shall have a valid, binding, continuing, enforceable, fully-perfected first-priority senior priming lien on, and security interest upon all pre- and post-petition property of the Debtors and any other obligors or credit parties under the DIP Facility, including, without limitation, cash and Cash Collateral of the Debtors (whether maintained with the DIP Agent or otherwise), and any investment of such cash and Cash Collateral, inventory, accounts receivable, letter of credit rights and other

rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, vehicles, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, capital stock of subsidiaries and the proceeds, product, offspring of profits of all the foregoing), whether now existing or hereafter acquired, that is subject to the existing liens (i) presently securing the Prepetition Obligations and (ii) that will secure the Prepetition Obligations in accordance with the DIP Orders. Such security interests and liens shall be senior in all respects to the interests in such property of the Prepetition Secured Parties arising from current and future liens of the Prepetition Secured Parties (including, without limitation, the Adequate Protection Liens granted hereunder).   For the avoidance of doubt, the Prior Permitted Liens (as defined below) are not being primed hereunder by the DIP Liens.

(c)    <u>Liens Junior to Certain Other Liens</u>. Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all pre- and postpetition tangible and intangible property of the Debtors and the Debtors' estates (other than the property described in clauses (a), (b) or (d) of this paragraph 10, as to which the liens and security interests in favor of the DIP Agent will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date, unless expressly permitted under the DIP Documents, or to any valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, in each case, to the extent such liens are otherwise senior to the liens securing the Prepetition Obligations ("<u>Prior Permitted Liens</u>"),

21

which security interests and liens in favor of the DIP Agent are junior to such valid, perfected and unavoidable liens.

(d) <u>Liens Senior to Certain Other Liens</u>.  The DIP Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, unless expressly permitted under the DIP Documents.

(e) Notwithstanding the foregoing clauses (a), (b), (c) and (d), the DIP Collateral shall exclude the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "<u>Avoidance Actions</u>"), but shall include any proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement or otherwise ("<u>Avoidance Proceeds</u>").

11. <u>Entitlement to Adequate Protection</u>.  The Prepetition Secured Parties are entitled to adequate protection of their respective interests in the Prepetition Collateral (including, but not limited to, the Cash Collateral) on which the Prepetition Secured Parties hold perfected security interests as of the Petition Date in an amount equal to the aggregate postpetition diminution in value of the Prepetition Collateral, including any Cash Collateral, from and after the Petition Date (such diminution in value, the "<u>Diminution in Value</u>"), including, but not limited to, to the extent such diminution results from the sale, lease or use by the Debtors of the Prepetition Collateral, including any Cash Collateral, the subordination of the

22

Prepetition Liens to the Carve-Out and the DIP Superpriority Claims and the DIP Liens, the

Debtors' incurrence of the DIP Obligations, or the imposition of the automatic stay pursuant to

Bankruptcy Code section 362 (such adequate protection, as set forth in paragraph 12 below, the

"Adequate Protection Obligations").  Nothing contained in the DIP Orders shall be deemed a

finding by the Court or an acknowledgement by the Prepetition Secured Parties that the adequate

protection granted in the DIP Orders does in fact adequately protect the Prepetition Secured

Parties against the Diminution in Value.

> 12.    Adequate Protection Granted to Prepetition Secured Parties.

> (a)    *First Lien Superpriority Claim and Adequate Protection Liens.*  The

Prepetition First Lien Secured Parties are hereby granted the following claims, liens and

security interests:

> (i)    ***First Lien Superpriority Claim.***  The Adequate Protection Obligations due to the Prepetition First Lien Secured Parties (the "First Lien Adequate Protection Obligations") shall constitute allowed joint and several superpriority claims against each of the Debtors as provided in Bankruptcy Code section 507(b) (collectively, the "First Lien Superpriority Claim"), with priority over any and all administrative expenses and all other claims asserted against the Debtors or their estates, at any time existing or arising, of any kind or nature whatsoever, including, but not limited to, the administrative expenses and other claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 327, 328, 330, 331, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113 and 1114, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, subject and subordinate in all respects to the Carve-Out and the DIP Superpriority Claims.  Except to the extent expressly set forth in this Final Order, the Prepetition First Lien Lenders shall not receive or retain any payments, property or other amounts in respect to the First Lien Superpriority Claim unless and until all DIP Obligations shall have been indefeasibly paid in full in cash.

> (ii)    ***First Lien Adequate Protection Liens.***  As security for the First Lien Adequate Protection Obligations, effective as of the Petition Date and perfected without the necessity of the execution by the Debtors (or

recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the Prepetition First Lien Secured Parties, the Prepetition First Lien Secured Parties are hereby granted valid, binding, continuing, enforceable, fully-perfected, non-avoidable additional and replacement liens on, and security interests in, the DIP Collateral (the "First Lien Adequate Protection Liens"), subject and subordinate only to the (w) Carve-Out, (x) DIP Liens and the (z) Prior Permitted Liens. The First Lien Adequate Protection Liens shall not be subject or subordinate to, or *pari passu* with, any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551 but shall be subject to the DIP Liens.

(b)     *Second Lien Superpriority Claim and Adequate Protection Liens.* The Prepetition Second Lien Secured Parties are hereby granted the following claims, liens and security interests:

(i)     **Second Lien Superpriority Claims.** The Adequate Protection Obligations due to the Prepetition Second Lien Secured Parties (the "Second Lien Adequate Protection Obligations") shall constitute joint and several superpriority claims against the Debtors as provided in Bankruptcy Code section 507(b) (the "Second Lien Superpriority Claim" and together with the First Lien Superpriority Claim, the "Prepetition Secured Parties' Superpriority Claims"), with priority over any and all administrative expenses and claims asserted against the Debtors or their estates, at any time existing or arising, of any kind or nature whatsoever, including, but not limited to, the administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 327, 328, 330, 331, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113 and 1114, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, subject only to the (v) Carve-Out, (w) DIP Superpriority Claim, and (x) First Lien Superpriority Claim. Except to the extent expressly set forth in this Final Order, the Prepetition Second Lien Secured Parties shall not receive or retain any payments, property or other amounts in respect to the Second Lien Superpriority Claim unless and until all DIP Obligations and the Prepetition First Lien Obligations shall have been indefeasibly paid in full in cash in accordance with the priorities set forth in the DIP Orders.

24

(ii) ***Second Lien Adequate Protection Liens***.  As security for the Second Lien Adequate Protection Obligations, effective as of the Petition Date and perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the Prepetition Second Lien Secured Parties, security interests in, and liens on, the DIP Collateral are hereby granted to the Prepetition Second Lien Secured Parties, subject and subordinate only to the (u) Carve-Out, (v) DIP Liens, (w) First Lien Adequate Protection Liens, (x) liens and security interests securing the Prepetition First Lien Obligations, and (y) the Prior Permitted Liens (if any), and subject further to the Intercreditor Agreement (all such liens and security interests, the "Second Lien Adequate Protection Liens," and collectively with the First Lien Adequate Protection Liens, the "Adequate Protection Liens").  The Second Lien Adequate Protection Liens shall not be subject or subordinate to, or *pari passu* with, any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551 but shall be subject to the DIP Liens, First Lien Adequate Protection Liens and Prepetition First Priority Liens.

(c) *Additional Adequate Protection.*

(i) ***Adequate Protection Payments***:  The Debtors are authorized and shall promptly pay in cash to the First Lien Agent, for the ratable benefit of the Prepetition First Lien Lenders, an amount equal to: (i) all interest and letter of credit fees accrued but unpaid as of the Petition Date calculated based on 100% of the then-applicable non-default rate as set forth in the Prepetition First Lien Loan Documents; and (ii) all interest and letter of credit fees accruing on or after the Petition Date under the Prepetition First Lien Loan Documents, calculated based on 100% of the applicable non-default rate set forth in the Prepetition First Lien Loan Documents, which shall be payable on a monthly basis on the 15th day of each month, or the next business day if the 15th is not a business day.  The aforementioned payments are without prejudice to the First Lien Agent's right to assert a claim for payment of additional interest at any other rates in accordance with the applicable governing documents, including the default rate, but without prejudice to the right of any party-in-interest with standing to do so to seek to recharacterize such payments as principal.  All computations of interest shall be made on the basis of a year of 360 days, except where the Prepetition First Lien Loan Documents provide for a computation of interest on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  For the

avoidance of doubt, (i) any interest that would otherwise accrue as a PIK Payment (as defined in the Prepetition First Lien Loan Documents) after March 15, 2016 shall not be payable in cash as set forth above and shall instead continue to accrue after March 15, 2016 and (ii) any fees associated with letters of credit payable under the Prepetition First Lien Loan Documents, whether prior to or after the petition date, shall also be payable in cash under this clause.

(ii)   **Steering Committee Fees and Expenses.**  The Debtors shall promptly pay in cash upon presentment, but in no event later than 10 days of presentment of an applicable invoice to the Debtors, all pre- and postpetition reasonable and documented fees, costs and expenses of (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"), as lead counsel to the Steering Committee, (b) Young Conaway Stargatt & Taylor, LLP ("Young Conaway"), as local counsel to the Steering Committee, (c) PJT Partners ("PJT") (including the Restructuring Fee as defined in PJT's engagement letter), as investment banker to the Steering Committee; provided that, except to the extent such fees and expenses constitute DIP Obligations, such fees and expenses are subject to recharacterization in accordance with paragraph 26 hereof. In addition, the Debtors shall reimburse each member of the Steering Committee for all reasonable and documented out-of-pocket costs and expenses incurred by such member in connection with these cases.

(iii)   **Ad Hoc Crossover Lender Group Fees and Expenses.**  Solely to the extent provided for and on the terms set forth in the Plan Support Agreement between the Steering Committee, Ad Hoc Crossover Lender Group and Debtors ("PSA"), the Debtors shall (1) promptly pay in cash upon presentment, but in no event later than 10 days of presentment of an invoice to the Debtors, all pre- and postpetition reasonable and documented fees, costs and expenses of (a) Weil, Gotshal & Manges LLP ("Weil"), as lead counsel to the Ad Hoc Crossover Lender Group, (b) Morris, Nichols, Arsht & Tunnell LLP, as local co-counsel to the Ad Hoc Crossover Lender Group, (c) Centerview Partners ("Centerview"), as financial advisor to the Ad Hoc Crossover Lender Group, including the Transaction Fee as defined in Centerview Partners' engagement letter (the "Centerview Transaction Fee"), and (2) reimburse each member of the Ad Hoc Crossover Lender Group for all reasonable and documented out-of-pocket costs and expenses incurred by such member in connection with these cases; provided, however, that the Debtors shall not pay or reimburse any fees, costs, and expenses pursuant to this clause (iii) incurred after the termination of the PSA or, with respect to any amount on account of the Centerview Transaction Fee, except upon the occurrence of the effective date of the Plan (as defined in the PSA). For the avoidance of doubt, (i) the foregoing fees and expenses

26

are subject to recharacterization in accordance with paragraph 26 hereof (subject to the reservation of rights of all parties) and (ii) the foregoing shall not limit Centerview's right to seek payment of the Centerview Transaction Fee pursuant to its engagement letter or otherwise at any time, and all parties' rights with respect to such issue are fully reserved.

(iv)    **Credit Bidding**.    The First Lien Agent and Prepetition First Lien Lenders shall have the right to credit bid up to the full amount of their Prepetition First Lien Obligations under the Prepetition First Lien Loan Documents and any obligations related thereto in connection with the sale of the Prepetition Collateral, including, without limitation, (a) pursuant to section 363 of the Bankruptcy Code, (b) a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code, or (c) a sale or disposition by a chapter 7 trustee.

(v)    **Access to Records/Financial Reporting**.    In addition to, and without limiting, whatever rights of access the Prepetition First Lien Lenders have under the Prepetition Documents, upon reasonable notice, at reasonable times and subject to appropriate confidentiality protections, the Debtors shall permit representatives and agents of the First Lien Agent (i) to have access to and inspect the Debtors' properties, (ii) to examine the Debtors' books and records, and (iii) to discuss the Debtors' affairs, finances and condition with the Debtors' officers and financial advisors.

(vi)    **Right to Seek Additional Adequate Protection**.    This Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Secured Parties to request additional forms of adequate protection at any time, or any party-in-interest's right to object thereto.  Any such request must be consistent with the Intercreditor Agreement.

13.    <u>Sufficiency of Adequate Protection</u>.  Under the circumstances and given that the Adequate Protection Obligations are consistent with the Bankruptcy Code, the Bankruptcy Court finds that such adequate protection is reasonable and sufficient to protect the interests of the Prepetition Secured Parties.  Except as expressly provided herein, nothing contained in this Final Order (including, without limitation, the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims or defenses available in law or equity to any Prepetition Secured Party, the DIP Agent or any DIP Lenders.

27

14.     The Adequate Protection Obligations (A) shall not be subject to sections 506(c), 510, 549, 550, and 551 of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (B) shall not be subordinate to, or pari passu with, (x) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any intercompany or affiliate liens or claims of the Debtors (including, for the avoidance of doubt, any rights or relief provided with respect to such liens or claims granted pursuant to the Bankruptcy Court's order authorizing the Debtors' to continue their cash management system, and (C) shall be valid and enforceable against any trustee, any other estate representative or litigation trust appointed in these Cases or any successor cases, and/or upon the dismissal of any of these Cases.

15.     Releases.  Each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its past, present and future predecessors, successors, heirs, subsidiaries, and assigns shall, to the maximum extent permitted by applicable law, be deemed to have forever waived, discharged and released each of the DIP Lenders, the DIP Agent, the Prepetition First Lien Secured Parties and each of their respective predecessors, successors, assigns, affiliates, members, partners, managers, current and former equity holders, agents, attorneys, financial advisors, consultants, officers, directors, employees and other representatives thereof (all of the foregoing, solely in their respective capacities as such, collectively, the "Releasees") of and from any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action (including, without limitation, causes of action in the nature of "lender liability"), defenses, setoff, recoupment or other offset rights against any and all of the Releasees, whether arising at law or in equity, relating to any of the DIP Documents, Prepetition First Lien Loan Documents, or the transactions contemplated under such documents, or the Chapter 11 Cases, including,

28

without limitation, (i) any recharacterization, subordination, avoidance or other claim or cause of action arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law or municipal law and (ii) any right or basis to challenge or object to the amount, validity or enforceability of the DIP Obligations, Prepetition First Lien Obligations or any payments made on account thereof, or the validity, enforceability, priority or non-avoidability of the DIP Liens or Prepetition First Priority Liens; provided, however, that solely with respect to the Prepetition First Lien Secured Parties, the foregoing releases are subject to the provisions of paragraph 26 hereof.

16.    Proceeds of Subsequent Financing.  If the Debtors, any trustee, any examiner with enlarged powers, any responsible officer or any other estate representative subsequently appointed in these Cases or any successor cases, shall obtain credit or incur debt pursuant to sections 364(b), 364(c) or 364(d) of the Bankruptcy Code in violation of the DIP Documents at any time prior to the indefeasible repayment in full in cash of all DIP Obligations and the termination of the DIP Agent's and the DIP Lenders' obligation to extend credit under the DIP Facility, including subsequent to the confirmation of any plan with respect to the Debtors and the Debtors' estates, and such financing is secured by any DIP Collateral, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied as set forth the DIP Documents.  The foregoing is without prejudice to all the rights and remedies the DIP Agent and DIP Lenders may have as a result of a breach of this Final Order or the DIP Documents.

17.    Disposition of DIP Collateral; Rights of DIP Agent and DIP Lenders.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP

29

Collateral, except as expressly permitted in the DIP Documents or with the consent of the Required Lenders and the Steering Committee.

18.    Protection of DIP Lenders' and Prepetition First Lien Lenders' Rights.

(a)    The automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified (and any stay of such vacation or modification under Bankruptcy Rule 4001(a)(3) is waived) without further order of the Bankruptcy Court to the extent necessary to permit the DIP Agent, DIP Lenders, First Lien Agent and Prepetition First Lien Lenders to exercise all rights and remedies provided for in the DIP Documents and this Final Order, including to take any or all of the following actions, without further order of or application or motion to the Bankruptcy Court, immediately upon the Termination Date or upon the occurrence of an Event of Default (as defined in the DIP Documents or as set forth in this Final Order), but subject in all respects to the Post-Carve Out Trigger Notice Cap, and subject to the DIP Agent or First Lien Agent providing not less than five (5) days' prior written notice (which five days' notice period (the "Notice Period") shall run concurrently with any other notice required under the DIP Documents) to the U.S. Trustee and counsel to the Debtors, of the DIP Agent's (or the First Lien Agent's, following the repayment and termination of the DIP Facility in respect of the Adequate Protection Obligations) intent to exercise such rights and remedies, including to: (i) immediately terminate the Debtors' use of any Cash Collateral; (ii) freeze monies or balances in the Debtors' accounts and sweep all funds contained therein and apply the same to pay the DIP Obligations; (iii) declare all DIP Obligations to be immediately due and payable; (iv) immediately set-off any and all amounts in accounts maintained by the Debtors with any DIP Agent or any DIP Lender or on their behalf against the DIP Obligations, or otherwise enforce any and all rights against the DIP Collateral in the

30

possession of the DIP Agent or any of the DIP Lenders or being held on their behalf, including,

without limitation, disposition of the DIP Collateral solely for application towards the DIP

Obligations; and (v) take any other actions or exercise any other rights or remedies permitted

under this Final Order, the DIP Documents or applicable law to effect the repayment of the

DIP Obligations; *provided that* the Debtors may request an expedited hearing on any motion

regarding an alleged Event of Default notice and the DIP Agent and the DIP Lenders shall

consent to such expedited hearing; provided further that the Debtors shall not have the right to

contest the enforcement of the remedies set forth in this Final Order and the DIP Documents on

any basis other than an assertion that an Event of Default has not occurred or that the Event of

Default has been cured within the cure periods expressly set forth herein or in the DIP

Documents; and *provided further* that during the Notice Period, the Debtors shall have no

authority to borrow under the DIP Facility, and the DIP Agent (or First Lien Agent, following

the repayment and termination of the DIP Facility) may condition the Debtors' continued

authority to use Cash Collateral during the Notice Period solely to payment of expenses critical

to preservation of the Debtors' estates and the payment of the fees, costs and expenses to

administer these Chapter 11 Cases.  The Debtors and the Prepetition Secured Parties shall

waive any right to seek relief under the Bankruptcy Code, including under section 105 thereof,

to the extent such relief would restrict or impair the rights and remedies of the DIP Agent and

the DIP Lenders set forth in this Final Order and in the DIP Documents.

(b)    Except as otherwise expressly set forth in the DIP Orders or the DIP

Documents, it shall be an immediate Event of Default hereunder and under the DIP Documents

if the Debtors shall, without the prior written consent of the DIP Agent (or the Steering

Committee, as the case may be), (a) grant or impose, under section 364 of the Bankruptcy

31

Code or otherwise, liens or security interests in any DIP Collateral, whether senior, equal or subordinate to the DIP Agent's liens and security interests; (b) to use, or seek to use, Cash Collateral in violation of this Final Order or the DIP Documents or (c) to modify or affect any of the rights of the DIP Agent or the DIP Lenders or the Prepetition First Lien Secured Parties under this Final Order or the DIP Documents by any plan of reorganization proposed or confirmed in these Chapter 11 Cases or subsequent order entered in these Chapter 11 Cases.

(c)    The DIP Agent's or any DIP Lender's delay or failure to exercise rights and remedies under the DIP Documents or this Final Order shall not constitute a waiver of such DIP Agent's or such DIP Lender's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the DIP Documents.

19.    <u>Approved Budget</u>.

(a)    For purposes of this Final Order, the term "<u>Approved Budget</u>" means the following: (a) for periods prior to entry of this Final Order, the initial budget attached to the Interim Order as Exhibit A, the "<u>Initial Budget</u>," and (b) following entry of this Final Order, the 13-week budget attached hereto as <u>Exhibit A</u>, as the same shall be supplemented in accordance with the procedures set forth below. Each Approved Budget shall contain line items of sufficient detail to reflect the Debtors' consolidated projected receipts and disbursements for the period covered thereby, including, without limitation, the anticipated uses of the DIP Facility and Cash Collateral for such period, and which shall also provide for, among other things, ordinary course expenses, payments to non-Debtor affiliates or foreign subsidiaries of the Debtors, payments of any amounts accruing prepetition that the Debtors have sought to pay pursuant to orders of this Court or otherwise, working capital and other

32

general corporate needs; provided further, that, the Operating Disbursements (as defined below) shall not include (i) any disbursements and expenses on account of fees and expenses owed to Professional Persons or (ii) any expense reimbursement payable to, or on behalf of, any of the DIP Agent, DIP Lenders or any Prepetition Secured Party; provided, however, the Debtors shall include an estimate of items (i) and (ii) even if not included as Operating Disbursements for purposes of the Budget Covenant (collectively, "Excluded Budget Items"). Beginning on Friday, April 22, 2016 and thereafter on every fourth Friday (or Thursday, if Friday is not a Business Day), the Debtors shall furnish to PJT Partners, on behalf of the DIP Agent, Required Lenders and Steering Committee, by no later than 3:00 p.m. (prevailing Eastern time) on such date, a supplement to the then Approved Budget covering a 13-week period that commences with the week following the week such supplement is delivered, and which contains sufficient detail to reflect the Debtors' consolidated projected receipts and disbursements for such 13-week period, together with a variance analysis from the then Approved Budget.  Such supplements to the budget shall become the Approved Budget upon the earlier of (a) written acknowledgement from the DIP Agent, Required Lenders and Steering Committee that the proposed supplement is in form and substance acceptable to and as approved by the DIP Agent, Required Lenders and Steering Committee (provided that any proposed changes in the proposed supplement to any of the budget figures already covered by the then Approved Budget must be satisfactory to the DIP Agent, Required Lenders and Steering Committee in their sole discretion) or (b) within 3 Business Days after receipt of such proposed supplement by the DIP Agent, provided that the DIP Agent, Required Lenders and Steering Committee have not provided a written objection to the proposed supplement; provided that the then Approved Budget shall remain the Approved Budget if the DIP Agent,

33

Required Lenders or Steering Committee object to the proposed supplement and until such time as the DIP Agent, Required Lenders and Steering Committee provide written acknowledgement that a revised version of the proposed supplement is otherwise in form and substance acceptable to and as approved by the DIP Agent, Required Lenders and Steering Committee.  Notwithstanding anything herein or in the DIP Documents to the contrary, unless specifically authorized hereunder or in writing by the DIP Agent, Required Lenders and Steering Committee, or as may be provided specifically in the Approved Budget and DIP Documents, no Cash Collateral may be paid or transferred to any non-Debtor subsidiary or affiliate of the Debtors.

   (b) The Debtors shall deliver to the DIP Agent with a copy to counsel to the Steering Committee by no later than 8:00 p.m. on Wednesday of each calendar week, (x) a variance report (the "Variance Report") setting forth in reasonable detail (1) actual cash receipts and disbursements for the prior week, (2) all variances, on an individual line item basis and an aggregate basis, as compared to the previously delivered budget on a cumulative weekly basis over a rolling four-week period (or such shorter period set forth in clause (c)(iii) below) ending on the Friday of the previous week, together with a statement certifying compliance with the Budget Covenants set forth below.  The Variance Report shall include an explanation, in reasonable detail, of any material variance and also show compliance with the minimum Liquidity requirement described in clause (c)(ii) below through the date of the Variance Report.  Notwithstanding the foregoing, information regarding receipts is not required to be included in the Initial Budget or any Variance Report provided with respect to the Initial Budget.

   (c) The Borrower shall ensure that at no time any of the following occur:

34

(i)    a negative variance by 20% or more from the designated "Operating Receipts" line in the Approved Budget ("Operating Receipts"), to be tested on a cumulative weekly basis over a rolling four-week period commencing in the sixth week following the Petition Date; or

(ii)    With respect to the designated "Operating Disbursements" line in the Approved Budget for ("Operating Disbursements"):

(A)    a negative variance of 25% or more, to be tested at the end of the second week following the Petition Date on a cumulative basis;

(B)    a negative variance of 20% or more, to be tested in the third and fourth week following the Petition Date (looking back over the preceding three and four week periods, respectively); and

(C)    thereafter, a negative variance of 20% or more, to be tested on a weekly cumulative basis over a rolling four-week period, provided that, once during a 12-week period, the Borrower shall be permitted to include in the calculation of the negative variance the net positive variance as shown in a Variance Report delivered in the prior 12-week period.

(iii)    The minimum Liquidity of the Debtors and their subsidiaries shall be less than $13,000,000 on any five consecutive Business Days, in which case the Debtors will notify the DIP Agent and Steering Committee forthwith.  "Liquidity" means, as of any date of determination, the aggregate amount of unrestricted cash and Permitted Investments (as defined in the DIP Credit Agreement) maintained by each Debtor and its subsidiaries on such date that are not subject to any lien or claim of any person unless such person is the DIP Agent or DIP Lender (other than (i) customary liens or rights of setoff of the institution maintaining such accounts permitted hereunder solely in its capacity as a depository and (ii) liens in connection with the Prepetition Obligations.

(iv) Any Debtor makes any disbursement other than an Excluded Budgeted Item not contemplated by the Approved Budget (giving effect to the foregoing variances) and without having received the prior written consent of the DIP Lender, Required Lenders and Steering Committee (in their sole discretion).

The foregoing provisions of this Paragraph 19 are referred to herein as the "Budget Covenant."

20.   Limitation on Charging Expenses Against Collateral.  Except to the extent of the Carve Out, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including a case under chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral or DIP Collateral pursuant to section 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the DIP Agent, the Required Lenders and Steering Committee, as the case may be with respect to their respective interests, and no consent shall be implied from any action, inaction or acquiescence by the DIP Agent, DIP Lenders or the Steering Committee.  In no event shall the DIP Agent, DIP Lenders or the Prepetition First Lien Secured Parties be subject to (i) the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code or (ii) the equitable doctrine of "marshaling" or any other similar doctrine with respect to the Prepetition Collateral or DIP Collateral.

21.   Payment of Fees and Expenses.  No payments of professional fees and expenses with respect to the DIP Obligations or Adequate Protection Obligations shall be subject to Bankruptcy Court approval or the requirements imposed by the U.S. Trustee Guidelines, and no recipient of any such payments shall be required to file any interim or final fee applications

36

with the Bankruptcy Court or otherwise seek Bankruptcy Court's approval of any such payments; provided that copies of any such invoices, which may be redacted for privilege, shall be provided to the U.S. Trustee at least ten (10) days prior to the payment thereof. For the avoidance of doubt, the payment of any such Adequate Protection Obligations are subject to recharacterization in accordance with paragraph 26 hereof. For the avoidance of doubt, all DIP Obligations and Adequate Protection Obligations described in paragraph 12(c)(i), (ii) and, solely to the extent payable thereunder, 12(c)(iii), shall be paid indefeasibly in cash in full on or before the effective date of any Acceptable Reorganization Plan (as defined in the DIP Credit Agreement), including any amounts that have accrued but are not yet due.

22.    <u>Credit Bid</u>.  The DIP Agent, on behalf of the DIP Lenders, shall have the right to credit bid under section 363(k) of the Bankruptcy Code a portion of or all of the DIP Obligations in connection with a sale of the Debtors' assets under section 363 of the Bankruptcy Code or under a plan of reorganization.

23.    <u>Perfection of DIP Liens</u>.

(a)    The DIP Agent and the DIP Lenders are hereby authorized, but not required, to file or record financing statements or take control over deposit accounts and securities accounts, in each case, in order to validate and perfect the liens and security interests granted to them under the DIP Orders.  Whether or not the DIP Agent on behalf of the respective DIP Lenders in their discretion, chooses to file such financing statements or take control over deposit accounts and securities accounts, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge dispute or subordination, at the time and on the date of entry of this Final Order.  Upon the request of the DIP Agent, without any further consent of any party, the DIP Agent, the Debtors

37

and each DIP Lender are authorized to take, execute, deliver and file such instruments (in each

case, without representation or warranty of any kind) to enable the DIP Agent to further perfect

the DIP Liens.

        (b)    A certified copy of this Final Order may, in the discretion of the DIP

Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such

financing statements, mortgages, notices of lien or similar instruments, and all filing offices are

hereby authorized to accept such certified copy of this Final Order for filing and recording.

For the avoidance of doubt, the automatic stay provisions of section 362(a) of the Bankruptcy

Code shall be modified to the extent necessary to permit the DIP Agent and DIP Lenders to

take all actions, as applicable, referenced in this subparagraph (b) and in the immediately

preceding subparagraph (a).

        (c)    Any provision of any lease or other license, contract or other agreement

that requires (i) the consent or approval of one or more landlords or other parties or (ii) the

payment of any fees or obligations to any governmental entity, in order for any Debtor to

pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds

thereof, or other DIP Collateral related thereto, is hereby deemed to be inconsistent with the

applicable provisions of the Bankruptcy Code.  Any such provision shall have no force and

effect with respect to the granting of post-petition liens on such leasehold interest or the

proceeds of any assignment and/or sale thereof by any Debtor in favor of the DIP Lenders in

accordance with the terms of the DIP Documents or this Final Order.

        24.    <u>Preservation of Rights Granted Under the Interim Order</u>.

        (a)    Except as expressly provided herein or in the DIP Documents, no claim or

lien having a priority senior to or *pari passu* with those granted by the Interim Order or this

Final Order to the DIP Agent, DIP Lenders shall be granted or allowed while any portion of the DIP Obligations or the Commitment (as defined in the DIP Documents), as the case may be, remain outstanding.

(b)    In addition to the Events of Default set forth in the DIP Documents, the Debtors shall not seek, and it shall constitute an Event of Default hereunder and under the DIP Documents if (1) any of the Debtors seek, or if there is entered, unless the DIP Agent, Required Lenders and Steering Committee have otherwise consented:  (i) any modification or extension of this Final Order without the prior written consent of the DIP Agent and Required Lenders, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Agent, (ii) an order converting or dismissing these Chapter 11 Cases and such order shall not have been reversed or vacated within ten (10) days; (iii) an order appointing a chapter 11 trustee in these Chapter 11 Cases and such order shall not have been reversed or vacated within ten (10) days, (iv) an order appointing an examiner with enlarged powers in these Chapter 11 Cases and such order shall not have been reversed or vacated within ten (10) days, (v) an order providing for a change of venue with respect to these Chapter 11 Cases and such order shall not have been reversed or vacated within ten (10) days; or (vi) an order approving a plan of reorganization or the sale of all or substantially all of the DIP Collateral or Prepetition Collateral (except to the extent permitted under the DIP Documents) shall have been entered which does not provide for the repayment in full in cash of the DIP Obligations (other than any contingent obligations not yet due and payable) upon the consummation thereof; (2) unless the DIP Agent, Required Lenders and Steering Committee have otherwise consented, (i) the PSA terminates in accordance with its terms or (ii) the Bankruptcy Court fails to enter an order assuming the PSA that is in form and substance acceptable to the DIP Agent, Required Lenders

39

and Steering Committee within fifty (50) days of the Petition Date; (3) unless the DIP Agent, Required Lenders and Steering Committee have otherwise consented, the Debtors breach a Budget Covenant or any other covenant hereunder in any material respect. If an order dismissing these Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (x) the Adequate Protection Obligations and DIP Superpriority Claims, priming liens, security interests and replacement security interests granted to the DIP Agent and the DIP Lenders, including the DIP Liens pursuant, to this Final Order shall continue in full force and effect and shall maintain their priorities as provided in this Final Order (and that such Adequate Protection Obligations, DIP Superpriority Claims, priming liens and replacement security interests, shall, notwithstanding such dismissal, remain binding on all parties in interest, including the priorities set forth herein and in the DIP Documents) until all Adequate Protection Obligations and DIP Obligations shall have been paid and satisfied in full and (y) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above. For the avoidance of doubt, the breach of this Final Order in any material respect shall (i) constitute an Event of Default and (ii) terminate the right of the Debtors to use of Cash Collateral hereunder.

(c)    If any or all of the provisions of the DIP Orders are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect (i) the validity of any DIP Obligations incurred prior to the actual receipt of written notice by the DIP Agent of the effective date of such reversal, modification, vacation or stay, (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Documents with respect to any DIP Obligations and (iii) the validity and enforceability of the

40

Adequate Protection Obligations and any Adequate Protection Lien granted in connection

therewith.  Notwithstanding any such reversal, modification, vacation or stay, any use of Cash

Collateral, or Adequate Protection Obligations or DIP Obligations incurred by the Debtors to

the DIP Agent, DIP Lenders or the applicable Prepetition Secured Parties prior to the actual

receipt of written notice by the DIP Agent or Steering Committee of the effective date of such

reversal, modification, vacation or stay shall be governed in all respects by the original

provisions of this Final Order, and the DIP Agent, DIP Lenders and Prepetition Secured Parties

shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of

the Bankruptcy Code, this Final Order and pursuant to the DIP Documents with respect to all

uses of Cash Collateral and proceeds of the DIP Facility and DIP Obligations.

(d)    Except as expressly provided in this Final Order or in the DIP Documents,

the DIP Liens, DIP Superpriority Claims, the Adequate Protection Obligations and all other

rights and remedies of the DIP Agent, DIP Lenders and Prepetition Secured Parties granted by

the provisions of this Final Order and the DIP Documents shall survive, and shall not be

modified, impaired or discharged by the entry of an order converting any of these Chapter 11

Cases to a case under chapter 7, dismissing these Chapter 11 Cases, approving the sale of any

Prepetition Collateral or DIP Collateral pursuant to section 363(b) of the Bankruptcy Code

(except to the extent permitted by the DIP Documents) or the entry of an order confirming a

plan of reorganization in these Chapter 11 Cases (except a plan that is acceptable to the DIP

Agent, Required Lenders and Steering Committee) and, pursuant to section 1141(d)(4) of the

Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations

or Adequate Protection Obligations.  The terms and provisions of this Final Order and the DIP

Documents shall continue in these Chapter 11 Cases, in any successor case, or in any

41

superseding chapter 7 case under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Obligations and the Adequate Protection Liens and all other rights and remedies of the DIP Agent, DIP Lenders and Prepetition First Lien Secured Parties under the DIP Documents or granted by the provisions of this Final Order shall continue in full force and effect until the DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full in cash as set forth in the DIP Documents.

25.    <u>No Liability to Third Parties</u>.  Nothing in the Interim Order or this Final Order, the DIP Documents, or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon any DIP Agent or any DIP Lender any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts.  In addition, (a) the DIP Agent and the DIP Lenders shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors; *provided that*, the foregoing shall not apply to any act or omission by the DIP Agent or the DIP Lenders that constitutes gross negligence or willful misconduct by the DIP Agent or the DIP Lenders as finally determined by a court of competent jurisdiction.

26.    <u>Effect of Stipulations On Third Parties</u>.

(a)    The stipulations, admissions, releases and waivers contained in this Final Order, including, without limitation, in paragraph 4 of this Final Order, shall be binding upon

42

the Debtors and their successors and assigns (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors).

(b)    The stipulations, admissions, releases and waivers contained in this Final Order with respect to the Prepetition Secured Parties, including, without limitation, in paragraph 4 of this Final Order, shall be binding on a permanent basis upon all other parties in interest, including any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases (including the Creditors' Committee, if any) and any other person or entity acting on behalf of the Debtors' estates, unless, (a) such committee or any other party-in-interest, in each case, with requisite standing granted by the Bankruptcy Court, has timely and properly filed an adversary proceeding or contested matter (subject to the limitations contained in the DIP Orders) against the Prepetition Secured Parties by no later than the date that is the later of (i) in the case of any such adversary proceeding or contested matter filed by a party-in-interest with requisite standing, 75 days after the Petition Date, (ii) in the case of any such adversary proceeding or contested matter filed by the Creditors' Committee, the earlier of (x) 60 days after the appointment of such Creditors' Committee and (y) the confirmation of a plan of reorganization in these Chapter 11 Cases, and (iii) any such later date agreed to in writing by the Prepetition First Lien Agent or the Prepetition Second Lien Indenture Trustee, as applicable (the "Challenge Period"), (1) challenging the validity, enforceability, priority, extent, or amount of the obligations under the Prepetition Documents or the Prepetition Obligations or the liens, subject to valuation under section 506 of the Bankruptcy Code, on the Prepetition Collateral securing the Prepetition Obligations or (2) otherwise asserting or prosecuting any avoidance actions or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Claims and Defenses") against the Prepetition Secured Parties or

43

their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors in connection with any matter related to the Prepetition Obligations or the Prepetition Collateral, and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding or contested matter; provided that, (i) as to the Debtors, all such Claims and Defenses are hereby irrevocably waived and relinquished as of the Petition Date and (ii) any challenge or claim shall set forth the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be forever deemed waived, released and barred.  If no such adversary proceeding or contested matter is timely and properly filed in respect of the Prepetition Obligations, (x) the Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, subordination, defense or avoidance, for all purposes in the Chapter 11 Cases and any subsequent Chapter 7 cases, (y) the liens on the Prepetition Collateral securing the Prepetition Obligations, as the case may be, shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the priority specified in paragraph 4, not subject to defense, counterclaim, recharacterization, subordination or avoidance and (z) the Prepetition Obligations, the Prepetition Secured Parties, and the liens on the Prepetition Collateral granted to secure the Prepetition Obligations, as the case may be, shall not be subject to any other or further challenge by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party-in-interest, and such committees and parties-in-interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including without limitation, any successor thereto (including, without limitation, any estate representative or a Chapter 7 or 11 trustee appointed or elected for any of the Debtors) with

44

respect thereto.  If any such adversary proceeding or contested matter is timely and properly filed, the stipulations, admissions, waivers and releases contained in paragraph 4 of this Final Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this subparagraph) on any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases and any other party-in-interest, except as to any such findings and admissions that were expressly and successfully challenged in such adversary proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction (and, in the case of a successful challenge, nothing in this Final Order shall preclude the Court from ordering an appropriate remedy, including disgorgement or recharacterization of any fees and expenses or other amounts paid as Adequate Protection Obligations).   Nothing in this Final Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, Claims and Defenses with respect to the Prepetition Documents or the Prepetition Obligations or any liens granted by any Debtor to secure any of the foregoing.   To the extent a chapter 7 or chapter 11 trustee is elected or appointed for any of the Debtors prior to the expiration of the Challenge Period, the Challenge Period solely with respect to such trustee shall be extended until the date that is 20 days from the date of such trustee's appointment or election (or as otherwise ordered by this Court for cause shown), and in the event a chapter 11 or 7 trustee is elected or appointed after a challenge has been properly and timely commenced in accordance herewith, such trustee may be substituted or added as the plaintiff or other proper party-in-interest in any such action or proceeding.

27.    Limitation on Use of Financing Proceeds and DIP Collateral and

Prepetition Collateral. Notwithstanding anything herein or in any other order by this Court to the

contrary, no party may use, and no borrowings, the Prepetition Collateral, the Cash Collateral,

the DIP Collateral, the DIP Facility, the Carve-Out, the Post-Carve Out Trigger Notice Cap or

any portion or proceeds of the foregoing may be used in connection with the following

"Prohibited Purposes" (a) objecting, contesting or raising any defense to, the validity, perfection,

priority, extent or enforceability of any amount due under the DIP Documents or the Prepetition

Documents, or the liens or claims granted under the DIP Orders, the DIP Documents or the

Prepetition Documents, (b) asserting any Claims and Defenses or causes of action against the

DIP Agent, the DIP Lenders, Steering Committee, First Lien Lenders or their respective agents,

affiliates, representatives, attorneys or advisors, (c) objecting to, contesting, preventing,

interfering, hindering or otherwise delaying the DIP Agent's, DIP Lenders', Steering

Committee's or First Lien Lenders' assertion, enforcement or realization on the DIP Collateral or

Prepetition Collateral once an Event of Default has occurred and is continuing in accordance

with the DIP Documents or this Final Order, *provided that* the Debtors may contest or dispute

whether an Event of Default has occurred, (d) objecting to or contesting the validity or

enforceability of this Final Order or otherwise seeking to modify any of the rights granted to the

DIP Agent, the DIP Lenders, Steering Committee, First Lien Agent or the Prepetition First Lien

Lenders hereunder or under the DIP Documents, Prepetition Documents or the PSA, in each of

the foregoing Chapter 11 Cases, without such parties' prior written consent, (e) paying any

amount on account of any claims arising prior to the Petition Date or non-ordinary course

administrative claim unless such payments are (i) approved by an order of this Court and (ii) in

accordance with the DIP Documents and the Budget Covenant, (f) using or seeking to use Cash

46

Collateral except to the extent permitted under the DIP Documents and not otherwise prohibited hereunder, (g) selling or otherwise disposing of the DIP Collateral except as permitted by the DIP Documents or otherwise with the consent of the DIP Agent, Required Lenders and Steering Committee, (h) using or seeking to use any insurance proceeds related to the DIP Collateral, except as permitted by the DIP Documents or otherwise with the consent of the DIP Agent, Required Lenders and Steering Committee; or (i) a request, without the prior consent of the DIP Agent and Required Lenders, for authorization to obtain debtor in possession financing pursuant to 364(c) or (d) of the Bankruptcy Code that does not indefeasibly discharge in full in cash DIP Obligations immediately upon the closing of such financing. Notwithstanding the foregoing, advisors to the Creditors' Committee, if any, may investigate claims and issues with respect to the liens and claims of, or causes of action against, the Prepetition Secured Parties in such capacity during the Challenge Period at an aggregate expense for such investigation, but not litigation, prosecution, objection or challenge thereto, not to exceed $50,000.

28.     <u>Priorities Among Prepetition Secured Parties</u>. Notwithstanding anything to the contrary herein or in any other order of this Court, in determining the relative priorities and rights of the Prepetition Secured Parties (including, without limitation, the relative priorities and rights of the Prepetition Secured Parties with respect to the Adequate Protection Obligations granted hereunder), such priorities and rights shall continue to be governed by the Intercreditor Agreement.

29.     <u>Retention of Jurisdiction</u>. This Court has and will retain exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, the DIP Documents, the Interim Order and this Final Order.

47

30.    <u>Order Governs</u>.  In the event of any inconsistency between the provisions

of the Interim Order, this Final Order, and the DIP Documents, the provisions of the Final Order

shall govern.  Except as specifically amended, supplemented or otherwise modified hereby, all of

the provisions of the Interim Order shall remain in effect and are hereby ratified by this Final

Order.

31.    <u>Binding Effect; Successors and Assigns</u>.  The DIP Documents and the

provisions of this Final Order, including all findings herein, shall be binding upon all parties in

interest in these Chapter 11 Cases, including, without limitation, the DIP Agent, the DIP

Lenders, the Prepetition Secured Parties, any statutory or nonstatutory committee appointed or

formed in these Chapter 11 Cases, and the Debtors and their successors and assigns (including

any chapter 7 trustee, chapter 11 trustee or similar responsible person or similar designee or

litigation trust hereinafter appointed or elected for the estate of the Debtors) and shall inure to the

benefit of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties and the Debtors and

their respective successors and assigns; *provided, however*, that the DIP Agent and the DIP

Lenders shall have no obligation to extend any financing to any chapter 7 trustee, chapter 11

trustee or similar responsible person or similar designee or litigation trust hereunder appointed or

elected for the estate of the Debtors.  In the event the DIP Obligations are repaid or terminate, to

the extent the Debtors seek the continued use of Cash Collateral, the terms of this Final Order

shall remain in effect and any reference to the DIP Agent, DIP Lenders or Required Lenders

hereunder shall be replaced with the First Lien Agent, Prepetition First Lien Lenders and

Steering Committee, respectively.

32.    <u>Limitation on Liability</u>.  In determining to make any loan under the DIP

Documents, permitting the use of Cash Collateral or in exercising any rights or remedies as and

48

when permitted pursuant to this Final Order or the DIP Documents, the DIP Agent, the DIP

Lenders and the Prepetition First Lien Secured Parties shall not be deemed to be in control of the

operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with

respect to the operation or management of the Debtors (as such terms, or any similar terms, are

used in the United States Comprehensive Environmental Response, Compensation and Liability

Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).  Furthermore,

nothing in this Final Order or in the DIP Documents shall in any way be construed or interpreted

to impose or allow the imposition upon the DIP Agent, the DIP Lenders, or the Prepetition First

Lien Secured Parties of any liability for any claims arising from the prepetition or postpetition

activities of any of the Debtors and their affiliates (as defined in section 101(2) of the

Bankruptcy Code).

      33.   <u>Effectiveness</u>.  This Final Order shall constitute findings of fact and

conclusions of law and shall take effect immediately upon execution hereof, and there shall be no

stay of execution of effectiveness of this Final Order.


Dated:    April 4, 2016
         Wilmington, Delaware

                             HONORABLE MARY F. WALRATH
                             UNITED STATES BANKRUPTCY JUDGE

PHIL1 5337801v.1